FILED
11/4/15 9:51 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | **Case No.  14-22724-GLT** |
| **COMMONWEALTH** | : | **Chapter 11** |
| **RENEWABLE ENERGY, INC.,** | : | |
| | : | |
| | : | |
| | : | |
| **RUTH F. ANDERSON, and** | : | |
| **KATHY L. ANDERSON, as executor of the** | : | |
| **ESTATE OF WILLIAM E. ANDERSON,** | : | **Related to Dkt. No. 39** |
| | : | |
| **Movants,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH** | : | |
| **RENEWABLE ENERGY, INC.,** | : | |
| | : | |
| **Respondent.** | : | |

*Appearances*:  Douglas A. Campbell, Esq., Paul J. Cordaro, Esq., and Frederick D. Rapone, Jr. of Campbell & Levine, LLC for the Debtor, Commonwealth Renewable Energy, Inc.

Robert O Lampl, Esq. of the Law Offices of Robert O Lampl, and Karen Y. Bonvalot, Esq. of Sherrard, German & Kelly, P.C. for Ruth F. Anderson and Kathy L. Anderson as the executor of the Estate of William E. Anderson

Kirk B. Burkley, Esq., Arthur W. Zamosky, Esq., and Daniel R. Schimizzi, Esq. of Bernstein-Burkley, P.C. for Stephen C. Frobouck and Steven Savor, Jr.

### MEMORANDUM OPINION

In November 2006, Bill and Ruth Anderson advanced over $7 million to Commonwealth Renewable Energy, Inc., a venture created by Bill Anderson and his colleagues, Steven Savor and Stephen Frobouck, to develop an ethanol production facility in Western Pennsylvania.  After the project failed to materialize, the Andersons[1] pursued an action in

---

[1]     Bill and Ruth were husband and wife until his passing in 2008.  As a matter of convenience, the Court uses the term "Andersons" to refer to Ruth and either Bill Anderson or his estate (as represented by their

mortgage foreclosure to recover the amounts due under a judgment note, prompting Commonwealth to file this bankruptcy case. The Andersons now seek relief from the automatic stay.

This Court must decide whether the advance constitutes a loan or an equity contribution. Because the parties originally intended the transaction to be a loan and the Court finds no credible evidence that Bill Anderson agreed to modify the obligation prior to his death, the Court concludes that the Andersons hold a secured claim against the bankruptcy estate. In the absence of any grounds to equitably subordinate the claim and without sufficient proof that the Property (as defined below) is necessary for an effective reorganization, the Andersons are granted relief from the automatic stay.

## I.

Anderson, Savor, and Frobouck were business associates with a long history of doing business together. In the early 1990s, Anderson and Savor formed the Anderson Group of Companies, Inc. ("AGC") to serve as a holding company for the various business enterprises in which they might invest. Frobouck became a shareholder in 1998 and, by that time, Anderson, Savor, and Frobouck each held a 1/3 interest in AGC. Under the AGC business model, Anderson, Frobouck, and Savor made capital contributions to AGC which, in turn, were invested by the company in various business opportunities. Through this investment vehicle, Frobouck and Savor claim their intent, together with Anderson, was to share the financial burdens and risk equally.

In August 2006, Anderson, Savor, and Frobouck embarked upon a new enterprise to develop an ethanol treatment facility on a 133.662-acre industrial site located in New Stanton,

_____

daughter, Kathy Anderson, in her capacity as executor of the Estate of William E. Anderson). The singular term "Anderson" shall mean Bill Anderson alone.

Pennsylvania (the "Property").  The site was owned by the Pennsylvania Industrial Development Authority ("PIDA") and formerly housed the Sony American Video Glass manufacturing facility.

Commonwealth was formed to acquire Sony's leasehold interest in the Property, together with an option to purchase the Property from PIDA.  In a departure from their prior transactions, AGC was not used to acquire the equity interests in Commonwealth.  Instead, Anderson, Frobouck, and Savor each controlled 1/3 of the voting shares.  Frobouck's and Savor's shares are held in their individual names, while the remaining third is owned by Anderson Energy Investments, LP ("AEI"), an entity controlled by Anderson.    Prior to Anderson's death, Anderson, Frobouck, and Savor were the directors of Commonwealth.  After Anderson's passing, Frobouck and Savor remained the sole directors.

Commonwealth's initial interest in the Property was acquired for $17 million.  Part of the purchase price was financed through Commonwealth's assumption of certain loan obligations owed to PIDA and the Pennsylvania Infrastructure Investment Authority.  Commonwealth also entered into an Indenture of Lease dated November 21, 2006 with PIDA.  To cover the remaining balance of the purchase price and closing costs, Commonwealth obtained an advance of $7,022,423.37 from the Andersons.

Commonwealth executed a *Judgment Note* in the amount of $20 million (the "Anderson Note") to evidence its obligations to the Andersons for the cash advance.  Although the amount advanced by the Andersons was substantially less than the face amount of the note, the parties wanted flexibility in the event additional advances were made in the future.[2]  The Anderson Note required Commonwealth to make monthly "interest-only" payments during a six-

---

[2]     Transcript ("Tr.") at  39:17—40:4 (Apr. 27, 2015).

month term.  The obligations under the Anderson Note matured on May 21, 2007, at which time

all principal and accrued interest was due and payable to the Andersons.

To secure the obligations under the Anderson Note, Commonwealth executed an

*Open-End Leasehold Mortgage and Security Agreement* dated November 20, 2006 (the

"Mortgage"), which granted the Andersons a mortgage lien upon its leasehold interest in the

Property.  In the event that Commonwealth acquired fee simple title to the Property, the liens and

security interests granted under the Mortgage would automatically attach to the fee interest.  The

Mortgage was duly recorded in the public records.  Both the Anderson Note and Mortgage were

signed by Frobouck (as president) and Savor (as secretary) on behalf of Commonwealth.

Each month, Kathy Anderson invoiced Commonwealth for the interest payments

due under the Anderson Note.  Commonwealth paid the six monthly interest payments according

to the terms of the note, although the last payment (billed on June 6), was not made until August

6, 2007.  It is undisputed that no further interest payments were made after August 6, 2007, and

there was never a payment made on the principal.

After the Maturity Date, Kathy Anderson continued to send the invoices to

Commonwealth each month through February 2010.   Upon receipt of the invoices,

Commonwealth recorded the interest accruals.   Erin Henninger, Commonwealth's office

manager, testified that she was responsible for maintaining Commonwealth's books and records

and would enter the interest accruals from the Anderson Note into Commonwealth's books long

after the maturity date had passed.[3]  She also continued to list the obligations under the Anderson

Note as a debt liability on Commonwealth's balance sheet through 2012.[4]

---

[3]     Henninger testified that she worked as Commonwealth's office manager until it discontinued office
operations in 2008.  She then began work as an office manager for Reserved Environmental Services, LLC
("RES"), an entity controlled by Frobouck and Savor and discussed more fully below.  Despite her new
position, Henninger continued to maintain Commonwealth's books and records while employed by RES.

Anderson, Frobouck, and Savor utilized two lines of credit from PNC Bank in connection with their projects. An initial $5 million line of credit was used for business which predated the Commonwealth transaction. When Commonwealth's cash requirements exceeded the remaining availability under the $5 million line, Anderson, Frobouck and Savor obtained an additional $10 million line of credit from PNC. Ruth Anderson was not a borrower on either one of the PNC credit lines, but she pledged certain securities jointly owned by her and Bill Anderson as collateral for the $10 million line of credit.

In its early stages, the ethanol treatment facility project was highly promising. Savor negotiated a five-year out-take agreement with BP Products North America, Inc. ("BP") by which BP would purchase all of the project's output of ethanol, including a pass through of the main input costs of natural gas and corn. Projected profits were estimated at as much as $0.22 per gallon for 127 million annual gallons produced.[5]

To achieve these projections, Anderson, Frobouck, and Savor recognized that development of the ethanol treatment project would require considerable outside investment. Once the Property rights were secured, Commonwealth engaged prominent Wall Street legal counsel to explore the bond financing market, and enlisted a well-known investment bank to solicit investors and handle investment inquiries. Through these efforts, the parties hoped to raise in excess of $40 million to convert the Property into a fully-functional facility. [6]

Despite its promise, Commonwealth was ravaged by the credit crunch in May 2007 which effectively dried up credit sources and eliminated any interest in the project by third-

---

Henninger was occasionally listed as assistant secretary of Commonwealth and was formally listed as corporate secretary of RES.

[4]     Exs. AA and C.

[5]     Ex. 11.

[6]     Ex. 11.

party investors.  This development caused Anderson, Frobouck, and Savor to revisit the business plan by considering a much smaller project than originally conceived.

During this time, Anderson met weekly with his financial advisor Mohammad A. Samad and Frobouck for lunch at Franco's Restaurant.  At one particular meeting in June 2007, Frobouck and Savor claim that Anderson agreed to cancel the Anderson Note and consider the indebtedness to be part of Anderson's equity investment in Commonwealth.  The discussion appears to have been prompted by Frobouck's suggestion that the Mortgage be modified to add Frobouck and Savor as mortgagees.   There is nothing in the record to support that Anderson ever agreed in writing to cancel the Anderson Note or add Frobouck and Savor as mortgagees to the Mortgage.

Anderson died on October 16, 2008.  Two months later, Ruth and Kathy Anderson filed a *Complaint in Confession of Judgment* against Commonwealth in the U.S. District Court for the Western District of Pennsylvania, arguing that the Anderson Note was in default and seeking payment of $7,881,969.67 plus late charges, interest, and attorney's fees. Judgment was entered on December 17, 2008.  The district court subsequently voided the judgment on April 19, 2010 because it lacked subject matter jurisdiction (lack of diversity).

CRE eventually paid off the PIDA loan and acquired title to the Property in 2010. Upon the transfer of ownership, the liens and security interests granted under the Mortgage automatically attached to the fee interest and became the first-priority liens against the Property.

On April 10, 2010, Commonwealth (by Frobouck and Savor) leased a ten-acre portion of the Property to RES, a company in which Frobouck and Savor held controlling membership interests (Savor 27 percent, Frobouck 22-24 percent).[7]  The term of the RES lease is

---

[7]        Tr. 20:20-22 (April 28, 2015).

fifty years, and RES holds an option to purchase its parcel for $6 million.  Ruth Anderson alleges that she did not give consent to the RES lease.

From 2008 to 2010, the parties continued discussions regarding ways to resolve their disputes.  When those discussions failed, Ruth and Kathy Anderson filed a complaint in mortgage foreclosure on October 26, 2010.  The state court was about to hear argument on the Andersons' motion for summary judgment when this bankruptcy case was commenced on July 3, 2014.[8]

The bar date to file claims has passed and only four claims were filed against Commonwealth.  Ruth Anderson filed a claim for a secured debt in the amount of $13,637,249.01, together with interest, attorneys' fees, and costs (the "Anderson Claim").  The Anderson Claim is premised upon the amounts owed under the Anderson Note and Mortgage. Savor and Frobouck each filed unsecured claims for approximately $11 million for funds advanced to Commonwealth.  The only other proof of claim was submitted by the Hempfield Township Tax Collector for $115,538.43 in prepetition taxes.

Commonwealth does not intend to reorganize as an ongoing concern.  On October 29, 2014, it filed a liquidating plan of reorganization that provides for the sale of the Property, its primary asset.[9]  Although the Property has been marketed by a real estate broker for over a year, Commonwealth has yet to seek Court approval of any purchase offers.  For the purpose of this

---

[8]    In addition to the foreclosure action, the parties were engaged in litigation on several fronts.  On July 24, 2012, AEI filed a derivative suit in the Court of Common Pleas of Allegheny County, Pennsylvania, alleging that, *inter alia*, Savor and Frobouck had misused their positions at Commonwealth to the financial detriment of the company and its shareholders. Frobouck and Savor then filed a declaratory judgment action on October 19, 2012, seeking a court determination of the relationships among Frobouck, Savor, Ruth and Kathy Anderson, and AEI, in connection with Commonwealth.  The actions were consolidated on July 10, 2014.  All actions have since been stayed by the bankruptcy.  Frobouck, Savor, and Commonwealth removed the consolidated actions to this Court on September 29, 2014, at adversary proceeding 14-2199-GLT.  Any further consideration of the adversary proceeding has been stayed pending the disposition of the Anderson's request for stay relief.

[9]    *See* Dkt. Nos. 79, 80.

Opinion, the parties agree that the Property has a value of less than $7 million which has not diminished since the bankruptcy case began.

Ruth and Kathy Anderson filed their *Motion for Relief from Stay or, in the Alternative, for Adequate Protection* on August 26, 2014.[10]   Their motion alleged that cause for relief exists under § 362(d)(1) because, among other things, Commonwealth is in default of its obligations under the Anderson Note and Mortgage and is unable to provide adequate protection. They further allege that Commonwealth has no equity in the Property and it is not necessary for an effective reorganization, and thus there are no grounds for relief under § 362(d)(2).

Commonwealth, Frobouck, and Savor opposed the motion, prompting the Court to conduct a two-day evidentiary hearing.  The Court heard testimony from Savor, Frobouck, Henninger, and Samad.  After the close of testimony, the Court requested post-trial briefing on certain issues.  Following submission of the post-trial briefs, the Court took the matters under submission.

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(G). Venue is proper under 28 U.S.C. § 1409.  This matter is now ripe for adjudication.

## II.

Before considering the motion for relief from stay, the Court must first examine the challenge to Ruth and Kathy Anderson's status as secured creditors.  Commonwealth, Frobouck, and Savor advance three arguments which implicate the treatment of the Anderson

---

[10]    Ruth and Kathy Anderson also brought a motion to dismiss the bankruptcy case or, in the alternative, seeking the appointment of a chapter 11 trustee at the same time as the motion seeking stay relief.  Dkt. 43. The Court will consider this motion after disposing of the stay relief motion.

Claim.[11]   It is first alleged that, notwithstanding their appearance as debt instruments, the Anderson Note and Mortgage represent capital contributions and should be recharacterized as such by the Court.  Frobouck and Savor also contend that the Anderson Note and Mortgage were expressly modified to render the $7 million advance as an equity investment in Commonwealth. As a final alternative, Commonwealth, Frobouck, and Savor seek the equitable subordination of the Anderson Claim.  The Court will address each of these arguments in turn.

## A.
## Recharacterization of the Anderson Claim

The Court's initial inquiry strikes at whether the Andersons' $7 million advance was a "loan" or a "capital contribution" to Commonwealth.  On their face, the Mortgage and Anderson Note bear all of the hallmarks of a debt instrument and security agreement. Commonwealth, Frobouck, and Savor request that we look beyond the documents and ascertain the parties' intentions through evidence of their past conduct.  Based on a series of prior transactions, they claim a long-standing business practice was established in which Anderson, Frobouck, and Savor agreed to share the investment burden and risk on an equal one-third basis in every business deal.  They allege that the same result was intended with respect to all funds advanced to Commonwealth.

Bankruptcy courts possess equitable authority to recharacterize a claim from debt to equity as a means of ensuring that form does not triumph over substance.  *See Cohen v. KB Mezzanine Fund II (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 457 (3d Cir. 2006) ("*Submicron*").  The determination of whether a debt actually exists is a question of fact that must be evaluated on a case-by-case basis as "[n]o mechanistic scorecard suffices."  *Id.* at 455-56.  The Third Circuit explains that "the determinative inquiry in classifying advances as debt or

---

[11]     As of this date, no party has filed a formal objection to the Anderson Claim.

equity is the intent of the parties as it existed at the time of the transaction." *Id*. at 457.  Intent

may be "inferred from what the parties say in their contracts, from what they do through their

actions, and from the economic reality of the surrounding circumstances." *Id*. at 456.

       To assist the court in its determination of the intent of the parties at the time they

created the Anderson Note and Mortgage, the Court looks to the "pertinent factors" used by five

United States Courts of Appeals.  The factors "are aimed at determining the intent of the parties

at the time they entered into the loan transaction."  *Vieira v. AGM II, LLC (In re Worldwide*

*Wholesale Lumber, Inc.),* 372 B.R. 796, 811 (Bankr. D.S.C. 2007).  These factors include:  (i)

the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or

absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a

fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or

inadequacy of capitalization; (vi) the identity of interest between the creditor and the

stockholder; (vii) the security, if any, for the advances; (viii) the corporation's ability to obtain

financing from outside lending institutions; (ix) the extent to which the advances were

subordinated to the claims of outside creditors; (x) the extent to which the advances were used to

acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.

*See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.)* 269 F.3d 726, 750-53 (6th Cir.

2001) ("*Autostyle*") (adopting the eleven-factor test set forth in an earlier, tax-related case, *Roth*

*Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630-32 (6th Cir. 1986)).[12]

---

[12]       The courts of appeals for the Fourth, Fifth, Tenth and Eleventh Circuits have adopted most of these eleven
factors as well as additional ones in their own recharacterization analyses.  *Ellinger v. United States*, 470
F.3d 1325,1333 (11th Cir. 2014);  *Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors*, 453
F.3d 225, 233 (4th Cir. 2006);  *Sender v. Bronze Group, Ltd. (In re Hedged-investments Assocs.*), 380 F.3d
1292, 1298 (10th Cir. 2004); *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); *In re*
*SubMicron*, 432 F.3d at 456.  Bankruptcy courts within the Third Circuit have utilized some or all of the
eleven factors to determine whether recharacterization is appropriate under a given set of circumstances.
*See, e.g.*, *Patel v. Shubh Hotels, LLC (*In *re Shubh Hotels Pittsburgh, LLC)*, 476 B.R. 181, 187-88 (Bankr.

After due consideration of each of these factors, the Court concludes that the Anderson cash advance was intended to be a loan at the time it was made. The analysis begins with the Anderson Note and Mortgage, which are unquestionably instruments of indebtedness. Titled as a "Judgment Note," the Anderson Note contains all of the salient terms necessary to establish a lending relationship between Commonwealth and the Andersons. It identifies the amount of the loan, sets a fixed rate of interest,[13] and creates an obligation for Commonwealth to repay the balance. By its own terms, the Anderson Note matured within six months of execution and requires monthly interest payments through the maturity date.[14] Although the absence of a fixed interest rate and regular payments is indicative of an equity infusion, the presence of both factors evidences a debt obligation. *Indmar Prods. Co. v. Comm'r*, 444 F.3d 771, 779 (6th Cir. 2006) (citing *Roth*, 800 F.2d at 630); *see also* 7 MERTENS LAW OF FED. INCOME TAX'N § 26:28 ("A fixed interest rate is indicative of a deductible interest payment.").

The complexity of the documents substantiates their classification as debt instruments. These were not generic or "form" documents. Rather, the Anderson Note and Mortgage were carefully drafted by Commonwealth's legal counsel to address the unique aspects of the transaction. Notably, the Mortgage navigated the intricacies of Commonwealth's relationship with PIDA and provided a mechanism for the Andersons' liens to attach to the fee title in the event Commonwealth exercised its right to purchase the Property. While the absence

---

W.D. Pa. 2012); *Autobacs Strauss v. Autobacs Seven Co. (In re Autobacs Strauss)*, 473 B.R. 525 (Bankr. D. Del. 2012); *Neilson v. Agnew (In re Harris Agency, LLC), 465 B.R. 410, 421 (Bankr. E.D. Pa. 2011)*; *Official Comm. of Unsecured Creditors v. Highland Capital Mgmt., L.P. (In re Moll Indus., Inc.)*, 454 B.R. 574, 581 (Bankr. D. Del. 2011).

[13]     Ex. I, Anderson Note at ¶ 1 (providing a fixed interest rate of 8% per annum.)

[14]     *See* Ex. I, Anderson Note at ¶ 2.

of a written instrument may be compelling evidence of a capital contribution,[15] the existence of a highly-specialized promissory note and mortgage suggests the parties intended to create a secured debt.

Frobouck and Savor argue that the mere existence of an executed Anderson Note does not prove indebtedness, relying on *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)* 340 B.R. 266, 303 (Bankr. E.D. Pa. 2006).  They also claim that the presence of a fixed maturity date does not evidence a debt instrument, based on the holding in *Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, LP (In re Friedman's Inc.),* 452 B.R. 512, 520  (Bankr. D. Del. 2012).  The Court finds both cases to be inapplicable.  In *Brand* and *Friedman's*, the court was confronted with documents that did not require principal payments for several years.  Finding it unreasonable to provide for a lengthy loan term without at least some principal pay down, the *Friedman's* court concluded that the parties intended an equity contribution.  *Id.*  Similarly, the *Brand* court determined that, despite the existence of written promissory notes, the amount in controversy was not a debt because, over the course of a five-year term, there was no payment of principal and this was inconsistent with the "economic reality" of the parties.  *Id.*

The Anderson Note, in contrast, provides an abbreviated loan term and defers principal payments for only six months.  The transaction had a short fuse because the parties envisioned this to be a temporary solution until a permanent credit facility could be obtained.[16] Indeed, Commonwealth's counsel, the drafter of the instruments, described the Anderson Loan

---

[15]    *See Autostyle,* 269 F.3d at 750.

[16]    Tr. 214:1-6 (Apr. 27, 2015).

and Mortgage as a "bridge loan" in an e-mail to Savor and Samad.[17]  Commonwealth already

obtained a commitment from BP that was projected to generate a steady income stream, and it

was actively soliciting outside investment for the purpose of, among other things, repaying the

$7 million advance.   Unlike the parties in *Brand* and *Friedman's*, the Andersons had a

reasonable expectation of full repayment within a year,[18] and the documents accurately reflect a

short-term financing arrangement.

      To enhance the likelihood of repayment, Commonwealth armed the Andersons

with remedies to compel performance.  As security for its obligations under the Anderson Note,

Commonwealth pledged a lien against its interest in the Property and provided a litany of

protections which are generally unavailable to equity holders.[19]   The Anderson Note also

contains a confession of judgment clause which provides an immediate mechanism for

enforcement.[20]  When a creditor secures a transaction with a lien, courts typically conclude that a

loan was intended.  *Autostyle*, 269 F.3d at 751.   Moreover, the existence of these features is

probative of the parties' intent to be bound by the precise terms of the instruments as written.

      Frobouck and Savor contend that no security could be provided when, in reality,

the Property was valueless.  This is a most puzzling argument in light of the factual record.  At

the time the Mortgage was recorded, the Property was anything but "valueless."  The parties

envisioned tremendous potential for the facility, and a prominent investment bank, Houlihan

---

[17]     Ex. VV.

[18]     In reaching this conclusion, the Court finds that it was rational to expect the repayment to be funded from third-party financing or investment.  When, at the time a cash advance is made, a prudent investor has a reasonable expectation of repayment from an obligor's cash flow or outside financing, the economic reality suggests a valid debt has been created.  *State St. Bank & Trust Co.*, 520 B.R. at 77.  Conversely, advances which can only be paid from profits or liquidation proceeds are considered equity investments since they are "at the risk of the venture."  *Scriptomatic, Inc. v. U.S.*, 397 F. Supp. 753, 764 (E.D. Pa. 1975).

[19]     *See* Ex. I, Mortgage at ¶ 16(b).

[20]     Ex. I, Note at ¶ 10.

Lokey, projected a valuation as high as $435 million.[21]  Anderson estimated his own share to have a potential value in excess of $100 million, presumably based upon these projections.[22] The Andersons also received the benefit of a $20 million title insurance policy issued by Chicago Title Insurance Company.[23]  The parties certainly would not have taken precautions to protect the Mortgage, including payment of a $36,000 insurance premium, if the liens were merely illusory.[24]  Although the Mortgage initially attached to Commonwealth's leasehold interest and remained subordinate to the liens held by PIDA, these actions reflect that, at a minimum, Anderson believed his debt was fully secured.

The Court is unconvinced that, at the time it was made, the Andersons' $7 million advance was subject to any long-standing agreement between Anderson, Frobouck, and Savor to share investment risks and rewards equally.  While the parties may have agreed to a one-third split in their previous transactions, this deal took on a distinctly different flavor.  The parties dispensed with using AGC as the investment vehicle and, instead, made all of their advances directly to Commonwealth.  Unlike the prior transactions, Ruth Anderson was directly involved as a named party in the instruments and a security agreement was executed in connection with the cash advance.

After reviewing the documentation prepared at the time of the advance, the Court is struck by the overwhelming number of items that support the existence of a loan, and the lack

---

[21]     Ex. 105.

[22]     Ex. 40.

[23]     Ex. UU.

[24]     Ex. TT.  The Court also observes that as late as 2008, the parties were cautious about any business decision that might affect the validity of the mortgage.  Counsel for Commonwealth cautioned Samad that there may be negative consequences to the securitization of the mortgage if the parties changed Commonwealth from a C Corporation to an LLC. Ex. FF.

of contemporaneous documents indicative of a capital contribution.  In 2006, Commonwealth's balance sheet reflected a $7,022,428.37 loan from Bill Anderson as one of the company's "current liabilities."[25]   Conversely, the register of capital contributions maintained by Commonwealth failed to show the $7 million advance as an equity contribution.[26]

As the transaction unfolded, the parties had no qualms describing the advance as a loan in their dealings with third parties.  In November 2006, PIDA provided its written consent to the placement of a leasehold mortgage on the Property for the benefit of the Andersons.[27]  The consent was given based upon PIDA's express understanding that the mortgage would "secure a loan" made by the Andersons "for various purposes related to the acquisition and modification of the project property..."[28]

Commonwealth's tax returns also identified the $7 million advance as a loan. From 2006 to 2012, the advance was classified as a "loan from shareholder" or "other liabilities" on the Commonwealth income tax returns.  By 2012, the Commonwealth tax return showed $337,006 in accrued interest due on the Anderson Note and Mortgage.[29]  Each return was prepared from information supplied by Commonwealth's employees to its accountants and was signed by Frobouck in his capacity as president.[30]

Anderson, Frobouck, and Savor were savvy businessmen who recognized the distinction between debt and equity in their dealings with Commonwealth.  An examination of

---

[25]      Ex. X

[26]      Ex. Y.

[27]      *See* Ex. SS.

[28]      *Id*.

[29]      Ex. W at CRE 04246.

[30]      Exs. Q-W.

the Andersons' advances bears this out.    While the Andersons' initial $7 million was documented as a loan, other advances were treated differently.    By contrast, Anderson's subsequent infusion of $3.4 million to partially satisfy the PNC line of credit was deemed an equity investment in Commonwealth.  Anderson did not add the $3.4 million to the indebtedness owed under the Anderson Note, nor did he claim it was secured by the mortgage.  The Court finds this to be compelling evidence that the loan documentation was no accident, but rather, the product of deliberate choices made by the parties with full knowledge of their consequences.

The testimony of Frobouck and Savor is the only material evidence suggesting the advance was an equity contribution at the time it was made.  The Court finds this evidence unpersuasive considering the way Frobouck and Savor vascillate on the characterization of their own advances over the years.  In 2009, both attempted to convert their admitted capital contributions into a debt secured by a mortgage lien.[31]  After they subsequently disavowed this effort,[32] Frobouck and Savor each filed unsecured proofs of claim in this bankruptcy case, reserving the right to categorize their separate $11 million contributions as loans to the extent necessary.[33]  The wavering is not limited to their own contributions, either.  In contrast to its current position, Commonwealth previously asserted (in a statement verified by Frobouck) that Anderson agreed to convert his secured claim into a capital contribution in June 2007.[34]  This serves as an acknowledgement that the advance was originally cast as a loan.  At the June 2007 meeting at Franco's, Frobouck also admitted he wanted the Mortgage to remain in place as a prophylatic measure to discourage subordinate claims, including mechanics liens, from being

---

[31]     Exs. GG and II.

[32]     Ex. KK.

[33]     *See* Claims 2 and 3.

[34]     *See* Ex. B at ¶ 52.

filed against the Property.[35]   From this record, it appears that Frobouck and Savor do not view "debt" and "equity" as static characterizations, but rather, interchangeable labels that can be altered as needed to suit their needs.  For this reason, the Court finds their testimony unreliable.

Although our court of appeals warns against excessive reliance on mechanistic scorecards, it observed that the presence of one group of factors could make it "easy" for a court to deny recharacterization of debt as equity.  Upon finding a document titled as a "note" which calls for payments of a sum certain at fixed intervals with market-rate interest and secured by a pledge of collateral, the Third Circuit suggests the determination is clear-cut and the inquiry can end there.  *See Submicron*, 432 F.3d at 456.  As discussed above, those features are present here. The Anderson Note required payments at fixed intervals at a market rate of interest which were partially performed and for which security was provided.  Upon consideration of these factors alone, the Court can confidently conclude that the Anderson Note and Mortgage were intended to be debt instruments at their inception and that no grounds exist to recharacterize the transaction.  While the evidence suggests that Anderson, Frobouck, and Savor sought to make equivalent advances to the company (and in fact they kept track of the amounts), the question before the Court is not *how much* each party funded, but rather, the *terms* by which the advance was made.  The Court cannot easily cast aside the corporate form and transactional details used in the Commonwealth deal that was markedly different from those that preceded it.  Based on its analysis of the eleven factors, credibility determinations of witness testimony and documentary evidence, and the economic reality of the parties, the Court concludes that the funds advanced by Anderson and secured by the Anderson Note and Mortgage represent a debt obligation of Commonwealth and do not qualify as a capital contribution.

---

[35]      Tr. 9:1-9 (April 28, 2015).

17

# III.

## Alleged Modification of the Anderson Debt Obligations

Having determined that the Anderson Note and Mortgage were intended to be a debt obligation of Commonwealth at the time of execution of the documents, the Court now turns to whether the parties later agreed to convert the debt into an equity contribution.  It is undisputed that economic conditions deteriorated after 2006, leaving Commonwealth in a position where it could no longer develop an ethanol production facility with BP.  Facing this new reality, Frobouck and Savor allege that Anderson agreed to reposition the company to pursue other opportunities.  An apparent stumbling block to the strategy was the Anderson Note and Mortgage.  In June 2007, Frobouck met with Anderson and Samad.[36]

Frobouck testified that Anderson asked if the Anderson Note and Mortgage should be modified.  According to Frobouck, he told Anderson to leave the instruments in place to protect their investments:

> … Bill Anderson actually asked me the question, should we remove the mortgage and I said no.  We'll leave the mortgage there, you know, basically, to save the certain purpose that it's been there since the very beginning, you know, to secure the equity that he and Bill, that he and Steve and I had in the project[.]

Tr. 9:2-6 (April 28, 2015).

The Court considers the evidentiary implications of this discussion in two ways: first, both Anderson and Frobouck considered the Anderson Note and Mortgage as a binding, secured debt obligation that was already in place.  Second, they left the mortgage intact to serve as a barrier to the enforcement of junior debt.  Although Frobouck suggests the mortgage protected the investment of all three shareholders (a contention which is not substantiated by

---

[36] Despite representations in Frobouck and Savor's pretrial brief that Savor was present at the meeting, testimony elicited at the hearing establishes that he was not.

written documentation in the record), his testimony confirms that a decision was made to retain the Anderson Note and Mortgage for the purpose of preserving their character as a debt obligation.

There is no further evidence in the record that Anderson, Frobouck, and Savor ever met and formally decided to modify, satisfy, or release the Anderson Note and Mortgage. It is also significant that the parties never bothered to document any such arrangement in the sixteen months which elapsed between the Franco's meeting and Bill Anderson's death. Frobouck and Savor are sophisticated businessmen who were trained as attorneys and were familiar with the documentation necessary to memorialize these arrangements. They also had outside legal counsel and accountants at their disposal. If there was an understanding with the Andersons to dramatically shift $7 million from the liability ledger to equity, the Court expects at least one written agreement would exist to substantiate it.

The Court also finds no support for a modification from the parties' actions following the June 2007 meeting. Savor and Frobouck argue that Bill Anderson ceased collecting interest payments after the meeting and did not foreclose on the Mortgage once the obligations matured. They contend that a failure to foreclose upon a mortgage is evidence that the transaction was an investment, not a debt. *United States v. State St. Bank & Trust Co*., 520 B.R. 20, 23 (Bankr. D. Del. 2014) (citing *Aquivo v. Black (In re Atlantic Rancher, Inc.)*. 279 B.R. 411 (Bankr. D. Mass 2002). While the allegation that Bill Anderson ceased to collect payments after maturity is correct, it is also misleading. Kathy Anderson continued to send invoices to Commonwealth for the monthly interest accrual through February 2010.[37] Although

---

[37]    Although Frobouck and Savor have claimed the invoices stopped coming in October 2008, the record contains copies of invoices from November 2006 through February 2010. Exs. O, C.

the invoices were unpaid, there is nothing in the record to indicate that she was told to discontinue this practice.

Henninger, who maintained the books and records for Commonwealth on a daily basis, was not informed of any modification. Although she was told to stop issuing payments to the Andersons, she was not instructed to stop accruing interest. Instead, Henninger dutifully recorded the interest expense in Commonwealth's corporate records consistent with the invoices she received from Kathy Anderson. In the months and years following the June 2007 meeting, she continued to show the Anderson Note and Mortgage as a loan on Commonwealth's financial statements and reported this information to Commonwealth's accountants for the preparation of the corporate income tax returns. If the parties agreed (after June 2007) that the funds advanced by Anderson were equity rather than debt, there would have been no need to record the interest accruals on Commonwealth's financials.[38] The evidence establishes that Henninger had regular conversations with Frobouck and Savor, and the two reviewed her books and records.[39] She therefore had reason to know of any changes in the Commonwealth's debt structure. If the person most knowledgeable about Commonwealth's financial records was unaware that the Anderson loan had been modified, the Court certainly cannot reach this conclusion.

Even if the Court would consider that Bill Anderson orally agreed to alter or extinguish the Mortgage, the modification is barred by the Parol Evidence Rule and Pennsylvania's Statute of Frauds, 33 Pa. Stat. § 1. Both the Anderson Note and Mortgage

---

[38]   The Court also notes that Commonwealth's final interest payment was made in August 2007, two months after the Franco's meeting at which Anderson allegedly agreed to convert his debt into equity. Again, had the parties agreed in June 2007 to convert, there would have been no need to pay any further interest payments.

[39]   Tr. at 108: 3-4; 129:1-5 (Apr. 27, 2015). The Court also notes that the balance sheets and monthly operating reports produced by Commonwealth during these bankruptcy proceedings lists the amounts owed under the Anderson Note as liabilities rather than equity contributions.

contained restrictions strictly prohibiting oral modification of the documents.[40]    Moreover,

Pennsylvania case law holds that any agreement to modify a mortgage or refrain from enforcing

its terms is subject to the statute of frauds and must be in writing.  *Strausser v. PRAMCO,* 944

A.2d 761, 765 (Pa. Super. Ct.  2008); *see U.S. Bank N.A. v. JGKM Assocs., LLC,* 2015 WL

1474448, at *5 (E.D. Pa. March 13, 2015) (accepting *PRAMCO* as applicable law in

Pennsylvania and that any modification of mortgage falls under the statute of frauds and must be

in writing); *Hansford v. Bank of Am.*, 2008 U.S. Dist. LEXIS 65502, at *36 (E.D. Pa. August 26,

2008) (same); *Atl. Fin. Fed. v. Orianna Historic Assocs.*, 594 A.2d 356, 358 (Pa. Super. Ct.

1991); *Eastgate Enters., Inc. v. Bank & Trust Co. of Old York Road*, 345 A.2d 279 (Pa. Super.

Cit. 1975); *see also Phoenix Four Grantor Trust #1 v. 642 N. Broad St. Assocs.*, No. 00-597,

2000 WL 876728, at *5 (E.D. Pa. June 29, 2000) ("[B]ecause the mortgages constitute interests

in land, under . . . Pennsylvania law, the statute of frauds requires any modification of those

mortgages to be in writing." (*citing Linsker v. Sav. of Am.*, 710 F. Supp. 598, 600 (E.D. Pa.

1989)).  Here, the Court finds no evidence of a signed agreement that varies the terms of the

Anderson Note and Mortgage.    It also concludes that Commonwealth, Frobouck, and Savor

failed to establish that any of the exceptions to the Statute of Frauds apply.

Commonwealth, Frobouck, and Savor challenge the proposition that mortgages

fall within the Statute of Frauds.  They rely upon decisions from the Nineteenth Century (and a

1931 case following those rulings) that suggest a mortgage represents only security for the

payment of money.  *Bulger v. Wilderman*, 101 Pa. Super. 168, 171 (1931), *citing Wilson v.*

---

[40]    Anderson Note at ¶ 6 ("Lender shall not be deemed, by any act of omission or commission, to have waived
any of its rights or remedies hereunder unless such waiver is in writing and signed by Lender, and then only
to the extent specifically set forth in writing."); and Anderson Mortgage at 25(j): ("This Mortgage is
intended as a document under seal and may only be amended, modified, supplemented, or waived by a
writing signed by Mortgagor [CRE] and Mortgagee [Anderson, Mrs. Anderson].  No course of dealing,
course of performance or trade usage, and no parol evidence of any nature shall be used to modify, amend,
supplement or waive any of the terms of this Mortgage.").

*Shoenberger Ex'rs*, 31 Pa. 295 (1858) and *McIntyre v. Velt*, 153 Pa. 350 (1893).  None of those cases specifically discuss the application of the Statute of Frauds to mortgages, and it is axiomatic that when formulating modern law, federal and state courts of Pennsylvania take these early cases into account.  The Court therefore finds the more recent rulings of *PRAMCO, Eastgate,* and *Orianna* instructive as to the current state of Pennsylvania law which requires mortgage modifications to be evidenced in writing.

     In addition to the lack of any written evidence, there is no proof that Ruth Anderson ever consented to a modification of Anderson Note and Mortgage.  Commonwealth admits that Ruth did not sign an agreement to convert the Anderson Note and Mortgage into a capital contribution, and that she failed to exhibit any conduct that would lead to this conclusion.[41]  Frobouck, Savor, and Henninger testified that they never dealt with Ruth on any business matters, and as far as Frobouck knew, no one else from Commonwealth consulted her either.[42]  While a contract may be altered after its formation, all parties must mutually agree to the new terms and consideration must be exchanged.  *See Great N. Ins. Co. v. ADT Sec. Servs.*, 517 F.Supp.2d 723, 736 (W.D. Pa.  2007);  *J.W.S. Delavau v. E. Am Transp. & Warehousing, Inc.*, 810 A.2d 672, 681 (Pa. Super. Ct. 2002) (citing *Corson v. Corson's Inc.*, 434 A.2d 1269 (Pa. Super. 1981)).   As a holder and co-owner of the Anderson Note and Mortgage, Ruth Anderson's approval was a prerequisite for any modification of the documents.  *See Wilcox v. Regester*, 417 Pa. 475 (1965); *Corson*, 434 A.2d at 1271.  Absent Ruth's consent, the contention that both Andersons agreed to convert their loan into an equity contribution falls flat.

---

[41]      *See* Commonwealth's Responses to Request for Admission.

[42]      Tr. at 30:14-31; 52:15-16; 136:18-23.

Frobouck and Savor suggest that Bill Anderson routinely made decisions for his wife Ruth. Even if this were true, there is no credible evidence in the record that Bill possessed the authority to unilaterally modify Ruth's rights under the documents. The Court is reluctant to ignore Ruth's independent ownership rights without a writing, and the absence of an executed consent, assignment, or power of attorney is compelling. As noted above, this transaction deviated from the path previously followed by the parties where advances were made to AGC which, in turn, invested in the various subsidiary businesses. Because the record fails to show that Ruth had any involvement in AGC, the Court concludes that Commonwealth was designed to be a decidedly different transaction and, therefore, Ruth's authorization was required before any modification could occur.

Finally, the Court does not consider the analysis and testimony of Samad as probative of an agreement to modify the instruments. Frobouck and Savor place great reliance on Samad's "investment analysis," a spreadsheet they claim to be proof of Bill Anderson's intent to share the cash burdens and risk equally with his colleagues.[43] While the analysis suggests an effort was undertaken to balance the amounts advanced to Commonwealth, Samad prepared it upon his own initiative and not at the request or direction of any party. It therefore sheds no light into the mindset of the principals, nor is it conclusive of any intent to re-cast the Mortgage as equity. To the contrary, the analysis distinguishes between funds advanced "via mortgage" from those made as direct investments or through payments on the line of credit. Samad's testimony further confirmed that, at least initially, the Anderson Note and Mortgage were deemed to be a legitimate, enforceable debt of Commonwealth.

To overcome the Statute of Frauds requires clear and convincing evidence with "full, complete, satisfactory, and indubitable proof" of the terms of the contract. *Kurland v.*

---

[43]    *See* Ex. 50.

*Stolker*, 533 A.2d 1370, 1373 (Pa. 1987).   Commonwealth, Frobouck, and Savor have fallen far below the minimum evidentiary and probative standards necessary to satisfy the Statute of Frauds and the Parol Evidence Rule in this case.   Faced with clear evidence of a secured loan from the Andersons, the Court is swayed by the absence of any contrary documentation substantiating an agreement to release or modify the Mortgage.   Although the testimony of Frobouck and Savor was offered to fill this void, the Court does not find these witnesses credible because their statements are inconsistent with Commonwealth's financial records which continuously recorded the $7 million advance as a liability.   Considering that Frobouck and Savor had both supervisory authority over the preparation of the financial statements and a major financial incentive for advocating their current position, the Court places more weight upon the contemporaneous financial records than the statements of two self-interested shareholders whose testimony can no longer be refuted by Bill Anderson.   Accordingly, the Court concludes that the Anderson Note and Mortgage remain valid and enforceable debt instruments and may be asserted as a claim against Commonwealth in this bankruptcy.

## IV.

### Equitable Subordination

Equitable subordination is a remedy provided in § 510(c), which states:

(c)   Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may —

(1)   under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim  or all or part of an allowed interest to all or part of another allowed interest; or

(2)   order that any lien securing such a subordinated claim be transferred to the estate.

24

Equitable subordination is "a 'remedial rather than penal' doctrine designed 'to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Schubert v. Lucent Tech., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003)).

Section 510(c) permits a bankruptcy court to subordinate an allowed claim, on equitable grounds, to the claims of other creditors of a debtor's estate. "In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate." *In re Mid-American Waste Sys., Inc*., 284 B.R. 53, 68 (Bankr. D. Del. 2002) (quoting *Burden v. United States*, 917 F.2d 115, 117 (3d Cir. 1990) in turn, quoting *Pepper v. Litton*, 308 U.S. 295, 307-08 (1939)).

The party seeking to subordinate a claim has the initial burden of coming forward with material evidence to overcome the prima facie validity accorded to proofs of claim. *Mid-American Waste*, 284 B.R. at 69. Then, the burden shifts to the claimant to demonstrate the fairness of its conduct. *Id*. The burden on the claimant is not only to prove the good faith of the parties to the transaction, but also to show the inherent fairness from the point of view of the debtor corporation and those with interests therein. *Id*.

In *Winstar*, the Third Circuit adopted a three-factor test that must be satisfied before determining if equitable subordination of a claim is appropriate: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in an injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3)

equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code. *Winstar*, 554 F.3d at 411. The *Winstar* three-part test is consistent with U.S. Supreme Court teachings. *U.S. v. Noland*, 517 U.S. 535 (1996) (describing existing case law as consistent with the three-part test originally identified in *In re Mobile Steel Co*., 563 F.2d 692, 700 (5th Cir. 1977)).

Frobouck and Savor have presented an extraordinarily confusing argument concerning allegedly inequitable conduct by Bill, Ruth, and Kathy Anderson. Under their legal theory, Bill used his interest in Commonwealth to over-leverage his investments and obtain excessive credit from S&T Bank and PNC Bank. Once the economic recession hit, Bill could no longer make the required payments to the banks. After his death, the banks put pressure on Ruth and Kathy Anderson to foreclose on the Anderson Note and Mortgage. Rather than pursue this remedy immediately, they claim that Ruth and Kathy Anderson waited in the bushes until Savor and Frobouck paid off the PIDA lien and then pounced with a foreclosure action after the Mortgage became the senior lien on the Property.

The Court fails to understand how any of this constitutes inequitable conduct as understood in the context of § 510(c) or *Winstar*. Anderson's financial decisions harmed himself, his family, and possibly the banks, but not Commonwealth or its creditors. That Ruth and Kathy Anderson might have baited Savor and Frobouck into paying off the PIDA lien is not supported by evidence in the record. In December 2008, two months after Bill passed away, Ruth and Kathy confessed judgment against Commonwealth, indicating their intent to enforce the terms of the documents as written. It was therefore apparent at least two years before the PIDA loan was satisfied (in October 2010) that Ruth and Kathy exhibited hostile intent with respect to Commonwealth, and a mortgage foreclosure action was foreseeable. And it stretches

credulity to suggest that two attorneys who are highly-successful entrepreneurs would be unaware that paying off the PIDA loan would elevate the Andersons' mortgage lien to first-priority status during a time when the Andersons were encountering financial difficulties.

The purpose of equitable subordination is "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Citicorp Venture Capital, Ltd.*, 323 F.3d at 233.  It is often wielded against insiders of the debtor to prevent harm to those who could not protect themselves, either due to deception or an unfamiliarity with a firm's capital structure, from overreaching by those with intimate knowledge of everything.

Where equitable subordination is sought against a non-insider creditor, the plaintiff bears a heavy burden. *Bank of N.Y. v. Epic Resorts (In re Epic Capital Corp.),* 307 B.R. 767, 772 (D. Del. 2004).  It must allege an "egregious level of misconduct" to satisfy the first prong of the *Winstar* test.  *Century Glove, Inc. v. Isellin (In re Century Glove, Inc.),* 151 B.R. 327, 333 (Bankr. D. Del.  1993).  It must also establish the claim with particularity.  *Bank of N.Y. v. Epic Resorts—Palm Springs Marquis Villas (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003).

Since Ruth and Kathy are not insiders, Frobouck and Savor fail to establish the first and most important of the *Winstar* factors, that Ruth and Kathy engaged in inequitable conduct.  Fraud, spoliation, breach of fiduciary duty, and the creditor's use of the debtor as a mere instrumentality are examples of egregious conduct justifying equitable subordination, but none of those factors are present here.  *See Waslow v. MNC Commercial Corp. (In re Paolella)*, 161 B.R. 107, 118 (E.D. Pa. 1993); *In re Aluminum Mills Corp.*, 132 B.R. 869, 896 (Bankr. N.D.

Ill. 1991).   Frobouck and Savor did not demonstrate with particularity how any actions undertaken by Ruth, Kathy, or even Bill Anderson rose to the level of egregious misconduct.

As evident by its name, the concept of "equitable subordination" requires that principles of equity are to be considered in any application of this remedy.   Since Frobouck and Savor are creditors who would stand to benefit from any imposition of an equitable subordination remedy against the Andersons, it is entirely appropriate for the Court to evaluate how their own conduct may have contributed to the circumstances for which they now find themselves.   *In re Papercraft Corp.*, 211 B.R. 813, 827 (Bankr. W.D. Pa. 1997) (remedy of equitable subordination of creditor's claim should be reconciled with principles of equity).

One principle of equity is that it will not aid a party which is not vigilant.   *Banco Urquijo, S.A. v. Signet Bank*, 861 F. Supp. 1220, 1251 (M.D. Pa. 1994) (finding bank failed to require monthly financial statements although entitled to do so); *Roeder v. Lockwood (In re Lockwood Auto Group, Inc.)*, 450 B.R. 557, 558 (Bankr. W.D. Pa. 2011). Frobouck and Savor were anything but diligent.   According to their testimony, the parties acknowledged Commonwealth's precarious financial position when they met at Franco's in June 2007.   After the discussion turned to the Mortgage, it is claimed that Anderson agreed to treat the $7,022,423.37 advance as a capital contribution.   To the extent this was the understanding, Frobouck and Savor had every incentive to ensure that it was properly documented.   As officers and directors of Commonwealth, they also possessed the tools and the resources to make it happen.   Frobouck and Savor were not unwitting participants in these transactions, but trained lawyers who were experienced in constructing venture capital investments capable of generating hundreds of millions of dollars.   Their failure to prepare a written modification in this instance indicates that the Andersons never agreed to such terms.

28

In short, Savor and Frobouck failed in their initial burden to overcome the prima facie validity of the Anderson claim.  They then failed the first two *Winstar* elements in not demonstrating how Bill, Ruth, and Kathy acted inequitably and caused injury to Commonwealth or its creditors.  In consideration of these factors, the Court denies the request to equitably subordinate the claim of Ruth Anderson and the Anderson estate.

## V.

### Relief from the Automatic Stay

The Court now turns to the question of whether Ruth and Kathy Anderson are entitled to relief from the automatic stay to proceed with their foreclosure action in the state court.  Section 362(d)(2) provides that relief must be granted with respect to a stay against property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."

As the proponents of the motion, Ruth and Kathy have the burden of proof on the issue of Commonwealth's equity in the Property.  The test in the Third Circuit for determining whether a debtor has any equity in property for purposes of § 362(d)(2)(A) focuses on comparing the total amount of all liens against the property and the current value of the property subject to the lien(s).  *Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs., Ltd)*, 61 F. 3d 197, 206 (3d Cir. 1995).  The term "equity" as it appears in § 362(d)(2)(A) is defined as the amount by which the value of a given property exceeds the total amount of the lien(s) or charges against it.  *In re Indian Palms Assocs., Ltd.*, 61 F. 3d  at 208.  If this value is equal to or less than the amount of the liens, there is no equity.

Ruth and Kathy have carried their burden of proof under § 362(d)(2)(A).  There is no doubt that Commonwealth has no equity in the Property.  The value of the Anderson Claim is

at least $7,022,428.37.  By contrast, the parties stipulate that the Property has a value of less than $7 million,[44] and it is likely the actual value is substantially less.  Commonwealth authorized its real estate broker to list the Property for sale at $6,850,000, but after sixteen months on the market, it remains unsold.  In his testimony, the broker expressed a belief that the Property will ultimately sell for between $3.5 million and $4 million.  Comparing the acknowledged lien totals against the current and anticipated value of the Property shows that Commonwealth has no equity in the Property.

Commonwealth has the burden of proving that the Property is necessary for an effective reorganization.  *See*  11 U.S.C. § 362(d); *In re Diversified Energy Venture*, 311 B.R. 712, 717 (Bankr. W.D. Pa. 2004).  As explained by the United States Supreme Court, property is necessary to an effective reorganization when it is "essential for an effective reorganization *that is in prospect*."  *United Sav. Ass'n of Tex. v. Timbers of Inwood Fores*t, 484 U.S. 365, 375-77 (1988) (emphasis in original).  Accordingly, there must be "a reasonable possibility of a successful reorganization within a reasonable time."  *Id.*

On this count, Commonwealth has not carried its burden of proof. Commonwealth has proposed a liquidating plan of reorganization.  Such plans are acceptable for § 362(d)(2)(B) purposes.  *In re Conroe Forge & Mfg. Corp.,* 82 B.R. 781, 785 (Bankr. W.D. Pa. 1988) ("In a liquidating Chapter 11 where Debtor has ceased operations and collateral value is not decreasing, ordinarily all property will be necessary for an effective reorganization."). However, Commonwealth cannot take comfort from the *Conroe Forge* decision because it has provided no evidence that the centerpiece of that liquidation, the sale of the Property, could realistically occur within a reasonable time period.

---

[44]      *See* Stipulation [Dkt. No. 190] at ¶ 9.

Courts have described the burden of proof necessary to establish a reasonable possibility of an effective liquidation as a sliding scale, where the debtor has great freedom in the early stages of bankruptcy and the burden enlarges as the bankruptcy case progresses. *In re Madco Prods.,* 2009 Bankr. LEXIS 5724, at *13 (Bankr. W.D. Tenn. June 16, 2009); *In re Holly's*, 140 B.R. 643, 701 (Bankr. W.D. Mich. 1992). When relief from stay is requested near the expiration of the exclusivity period, "the moving target burden of proof requires a greater showing than 'plausibility.'" *In re Holly's*, 140 B.R. at 701. Here, Commonwealth has not demonstrated that a successful reorganization within a reasonable period of time is "probable." Commonwealth has been marketing the Property for almost two years without success. Although the Property has been listed at $6.8 million and the court-appointed broker expressed a willingness to entertain offers in the $3.5 to $4 million range, Commonwealth has not brought forth any potential buyers willing to acquire the Property at any price.

Where there is only one asset of the debtor, the asset has no equity, and the debtor is not conducting any business, "there is no basis to conclude that property lacking equity has any value to the estate in a liquidating plan." *In re 6200 Ridge, Inc.*, 69 B.R. 837, 844 (Bankr. E.D. Pa. 1987). It is possible under some circumstances that a property without equity may still be productive, when it can be sold in a package with other assets. *Empire Enters., Inc. v. Koopmans (In re Koopmans),* 22 B.R. 395, 407 (Bankr. D. Utah 1982) (discussing, for example, liquidating plans where the property was needed to house inventory or other assets, or where the property could be combined with other assets to make a more profitable asset, such as assembling contiguous parcels of real estate). But in this case, there are no other assets and the Property has no equity. At this advanced stage of the bankruptcy, Commonwealth has not shown that it could realistically implement a liquidating plan within a reasonable time period.

Further, there are numerous impediments to an effective sale of the Property which prompts the Court to conclude that, even if a suitable buyer were found, approval is anything but inevitable. Ruth and Kathy Anderson have already indicated that they will oppose the proposed assumption of the RES lease in the plan. They challenge the validity of the lease due to various alleged improprieties and self-dealings by Frobouck and Savor which occurred when the lease was granted. Included among these allegations is the assertion that Ruth and Kathy Anderson did not consent to the RES lease, even though the mortgagees' consent is required by the Mortgage.[45] While this motion does not present the proper context to examine the circumstances surrounding the execution of the RES lease, enough legitimate questions have been raised to suggest that if Commonwealth insists on the lease assumption as part of the sale, it is not substantially certain that the sale will be approved. Based on the lack of any interest in the Property, Commonwealth's insistence that any sale include the assumption of the RES lease, numerous complications with that lease, and the near-certainty of protracted hearings on plan confirmation, the Court is forced to conclude that Commonwealth has not carried its burden of proof that there is a reasonable possibility of a successful reorganization/liquidation within a reasonable time.

In reaching this determination, the Court is influenced by the absence of any creditors who are unaffiliated with Anderson, Frobouck, or Savor. Indeed, the only independent creditor is the real estate tax collector who can expect to be paid regardless of whether a sale or foreclosure occurs because its lien is superior to the lien granted by the Mortgage. All of the remaining claims are either held by Frobouck, Savor, the Andersons, or an entity they own or

---

[45] *See* Ex. I, Mortgage at ¶ 10 (Commonwealth may not lease any part of the Property for purposes other than ethanol production without mortgagee's written consent); ¶ 7 (mortgagee's written consent required for construction or destruction of improvements on any part of the Property).

control.  The Court also finds it unlikely that any surplus funds will remain from the sale to pay

any parties other than the Andersons and the real estate taxing authorities.  As determined above,

Ruth Anderson and the estate of Bill Anderson hold a secured claim of at least $7,022,428.37,[46]

and they possess the ability to credit bid for the Property.   Considering that the Property

valuations range from $3.5 million to $6.8 million, the Andersons can expect to receive virtually

all of the proceeds from a sale.   Under these circumstances, the Court concludes that it is

improbable that Commonwealth can confirm a plan within a reasonable period of time that will

provide a benefit to anyone other than the Andersons.  For these reasons, the Andersons should

not bear any further delays and shall be granted relief from the stay.

The motion for relief from stay under § 362(d)(2) is GRANTED.   Because the

Court grants relief under this provision, it does not reach the merits of the motion for relief from

stay under § 362(d)(1).

An appropriate Order will issue.


November 4, 2015

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE


cm:    Debtor
       Douglas A. Campbell, Esq.
       Robert O Lampl, Esq.
       Karen Y. Bonvalot, Esq.
       Kirk B. Burkley, Esq.
       Arthur W. Zamosky, Esq.

---

[46]    It is unnecessary for the Court to determine the precise amount of the Anderson Claim at this stage since
the value of the Property does not exceed the outstanding principal amount owed.

33