FILED
2/10/16 1:27 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No.  14-22724-GLT |
| **COMMONWEALTH RENEWABLE ENERGY, INC.,** | : | Chapter 11 |
| | : | |
| | : | |
| | : | |
| **COMMONWEALTH RENEWABLE ENERGY, INC., STEPHEN FROBOUCK,** and **STEVEN SAVOR, JR.,** | : | |
| | : | |
| Movants, | : | |
| | : | |
| v. | : | |
| | : | |
| **RUTH F. ANDERSON,** and **KATHY L. ANDERSON,** as executor of the **ESTATE OF WILLIAM E. ANDERSON,** | : | Related to Dkt. Nos. 285, 300 |
| | : | |
| Respondents. | : | |
| | : | |

## MEMORANDUM OPINION

Before the Court is the *Joint Motion for Entry of an Order Staying Order Pending Appeal or, in the Alternative, Authorizing the Posting of a Supersedeas Bond to Stay the Order Pending Appeal and Granting Related Relief* (the "*Joint Motion*") of the Debtor, Commonwealth Renewable Energy, Inc. ("Commonwealth"), and creditors Stephen C. Frobouck ("Frobouck") and Steven Savor, Jr. ("Savor").  The Movants seek to stay this Court's November 4, 2015 Order granting relief from the automatic stay to Ruth Anderson and Kathy Anderson[1] (together, the "Andersons").  The Order authorizes the Andersons to proceed with a mortgage foreclosure

---

[1]     Kathy Anderson is a party to this action in her capacity as executor to the Estate of William E. Anderson.

involving Commonwealth's property in New Stanton, Pennsylvania (the "Property"). The

Andersons oppose the *Joint Motion*. For the following reasons, the *Joint Motion* is DENIED. [2]

A detailed recitation of the facts is contained within this Court's November 4,

2015 memorandum opinion. Anderson v. Commonwealth Renewable Energy, Inc. (In re

Commonwealth Renewable Energy, Inc.), 540 B.R. 173 (Bankr. W.D. Pa. 2015)

("Commonwealth"). In short, Ruth Anderson and her late husband, William E. Anderson,

advanced $7,022,423.37 to Commonwealth in 2006. The advance was secured by a mortgage

and security agreement which granted the Andersons a lien upon, among other things, the

Property. After this bankruptcy case was filed, the Andersons sought stay relief to continue a

foreclosure action against the Property in state court. The Movants opposed the request on the

grounds that the Anderson note and mortgage should be recharacterized as an equity contribution

to Commonwealth, either at the time the instruments were created or afterwards pursuant to a

modification of the instruments. Alternatively, the Movants argue that the Anderson claim

should be equitably subordinated to other claims in this bankruptcy estate. The Court ruled in

favor of the Andersons and the Movants timely appealed.

To determine whether a stay pending appeal is warranted, courts are to consider

the following four factors: "(1) whether the appellant has made a strong showing of the

likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay;

(3) would a stay substantially harm other parties with an interest in the litigation; and (4) whether

a stay is in the public interest." Revel AC, Inc. v. IDEA Boardwalk LLC, 802 F.3d 558, 565 (3d

---

[2] This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (G). The motion is timely under Fed. R. Bankr. P. 8007(a)(2). Although the appeal to the district court was filed on November 18, 2015, the parties used the ensuing two months to engage in settlement negotiations. After a definitive settlement agreement failed to materialize, the parties resumed their litigation posture. A mediation conference is scheduled to occur on February 16, 2016 to revisit the prospect of settling this and other pending issues between the parties. [Dkt. No. 332].

Cir. 2015) ("Revel")  (quoting Republic of Phil. v. Westinghouse Elec. Corp., 949 F.2d 653, 658

(3d Cir. 1991) (in turn citing Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).[3]

Revel is a comprehensive opinion instructing how the four factors are to be

evaluated.  Revel, 802 F.3d at 565.   It is now clear that courts must apply a "sliding scale"

approach to balancing the four factors.  Id. at 571.  The balancing requires an inquiry into the

relative strength of each factor.  Id. at 568 (citing Brady v. Nat'l Football League, 640 F.3d 785,

789 (8th Cir. 2011)).   Under this approach, if one of the factors tips heavily in favor of the

moving party, the burden of substantiating another factor may be lessened to a corresponding

degree.  Conversely, a deficiency in one area will require a much stronger showing in the others.

Revel, 802 F.3d at 569.

According to the Supreme Court, "the most critical" factors are the first two: a

strong showing of the likelihood of success and that the movant will suffer irreparable harm.

Nken v. Holder, 556 U.S. 418, 434 (2009).  Our circuit has clarified that, of the two, the first,

likelihood of success, is the most important part of the stay analysis.  Revel, 802 F.3d at 568.[4]

After the court has considered the two more important factors, the analysis shifts to the lesser

two, harm to other parties and consideration of the public interest.   Nken, 556 U.S. at 435.

---

[3]    Although Braunskill dealt with habeas petitions, the Supreme Court observed that the procedures regarding
stays pending appeal are comparable in both civil and criminal litigation.  See Braunskill, 481 U.S. at 775.

[4]    In this regard, the Revel court was particularly persuaded by the comments of Judge Posner in Roland
Mach. Co. v. Dresser Indus., 749 F.2d 380, 386 (7th Cir. 1984):

> [I]t isn't enough that the failure to obtain a stay will be "a disaster" for the stay movant
> but only a "minor inconvenience to the defendant," as "[e]quity jurisdiction exists only to
> remedy legal wrongs; [thus,] without some showing of a probable right[,] there is no
> basis for invoking it."

Revel., 802 F.3d at 569.

1.      Likelihood of success.

        With respect to the first factor, the Movants must make a strong showing of the

likelihood of success on appeal.  Recognizing that the "degree" to which a likelihood of success

must be proven can vary widely in the caselaw, the Revel court established the following

standard for courts to follow in this circuit:

> a sufficient degree of success for a strong showing exists if there is a
> reasonable chance, or probability, of winning. Thus, while it is not enough
> that the chance of success on the merits be better than negligible, the
> likelihood of winning on appeal need not be more likely than not[.]

Revel, 802 F.3d at 569 (internal quotation marks and internal citations omitted).

        After a careful review of the record and the *Joint Motion*, the Court concludes that

the Movants have not made a strong showing of "a reasonable chance, or probability, of

winning" on appeal.  The Movants steadfastly argue that the Anderson note and mortgage are

not debt instruments, but should be recharacterized as an equity contribution to the debtor by the

Andersons.  Upon consideration of these arguments, this Court provided an extensive analysis of

the caselaw on recharacterization based on the eleven factors set forth in Cohen v. KB

Mezzanine Fund II (In re Submicron Sys. Corp), 432 F.3d 448, 457 (3d Cir. 2006)

("Submicron") and concluded that the documents were debt instruments that could not be

recharacterized as equity.

        The Movants initially claim reversible error on the basis that the Court failed to

analyze three factors:  the adequacy or inadequacy of capitalization, the presence or absence of

voting rights, and the use of the funds to acquire capital advances. *Joint Motion* at ¶ 17. The

Court did indeed consider these elements,[5] but determined that they could not overcome the

---

[5]     The Court's opinion provided that its conclusion was "[b]ased on its analysis of the eleven factors" as well
        as the credibility determinations of witness testimony and documentary evidence, and the economic reality
        of the parties. Commonwealth, 540 B.R. at 186.

strong evidence that the documents were clearly labeled debt instruments, called for payments of a sum certain at fixed intervals with market-rate interest, were secured by a pledge of collateral, and reflected the intent that the Andersons were providing a "bridge loan."  As the Third Circuit has instructed, the presence of these characteristics may be sufficient to determine that they are debt instruments and the recharacterization inquiry can end there.  Submicron, 432 F.3d at 356.  Reaffirming the notion that some of the recharacterization elements are more important than others, recent court decisions strongly caution against the danger of placing too much weight on the undercapitalization element.  See Redmond v. Jenkins (In re Alternate Fuels, Inc.), 789 F.3d 1139 (10th Cir. 2015) ("placing too heavy an emphasis on undercapitalization in our recharacterization analysis would create an unhealthy deterrent effect, causing business owners to fear that . . . a court will give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.")

The Movants also challenge the Court's factual findings on appeal.  During the trial, the Movants advanced alternative arguments, suggesting that the parties agreed to convert the Anderson debt into equity in June 2007.  Failing that, they requested that the Anderson mortgage be subordinated based on the alleged inequitable conduct of the Andersons.  In addition to considering the written documentation in the record, the Court heard testimony from Frobouck, Savor, and Mohammad Samad on these topics but found their testimony unreliable.  The Movants now claim error based on the lack of weight the Court accorded to this evidence.  The Court will address each of these averments in turn.

The Movants claim that the Court found that there was "[n]o evidence supporting the notion that the Andersons baited Savor and Frobouck into paying off the PIDA lien." *Joint Motion* at ¶ 19a.  The Court did not state that there was no evidence; the Court's ruling was that

5

the alleged baiting was "not supported by evidence in the record."  Commonwealth, 540 B.R. at

191.  The Court then went on to explain how the Andersons' actions belied any assertion that

they concealed or misrepresented their true motivations:

> In December 2008, two months after Bill passed away, Ruth and Kathy
> confessed judgment against Commonwealth, indicating their intent to
> enforce the terms of the documents as written.  It was therefore apparent at
> least two years before the PIDA loan was satisfied that Ruth and Kathy
> exhibited hostile intent with respect to Commonwealth, and a mortgage
> foreclosure was foreseeable.  And it stretches credulity to suggest that two
> attorneys who are highly successful entrepreneurs would be unaware that
> paying off the PIDA loan would elevate the Andersons' mortgage lien to
> first-priority status during a time when the Andersons were encountering
> financial difficulties.

Id.

The Movants also assert that the Court found that there was "no evidence to

support Frobouck's contention that the Anderson Mortgage protected the investment of all three

shareholders."  *Joint Motion* at ¶ 19b.  This too, misstates the Court's finding.  The actual

wording of the Opinion was:

> Although Frobouck suggests the mortgage protected the investment of all
> three shareholders (a contention which is not substantiated by ***written
> documentation*** in the record), his testimony confirms that a decision was
> made to retain the Anderson Note and Mortgage for the purpose of
> preserving their character as a debt obligation.

Id. at 187 (emphasis added).  Having already questioned Frobouck's credibility,[6] the Court

observed that the absence of any written documentation to substantiate his testimony was

revealing.  The Court took this into account when assessing the value to be placed on Frobouck's

---

[6]     The Court previously noted that Savor and Frobouck's testimony was of dubious value because they were
        prone to vacillations when it advanced their own interests:

> From this record, it appears that Frobouck and Savor do not view "debt" and "equity" as
> static characterizations, but rather, interchangeable labels that can be altered as needed to
> suit their needs.  For this reason, the Court finds their testimony unreliable.

Commonwealth, 540 B.R. at 185-86.

testimony.    Since the Movants have not identified any documentary evidence which was

overlooked,[7] the Court reaffirms the finding that there is no written documentation in the record

to support Frobouck's contention.

      The Movants argue that the Court found that there was "no evidence that

Frobouck, Savor and William E. Anderson []ever bothered to document any such arrangement."

*Joint Motion* at ¶ 19(c), citing to the Court's opinion at 540 B.R. 187.   At that point in the

opinion, the Court was not discussing Frobouck's contention that the documents were intended

to protect the investment of all three investors.   Instead, it observed that there was no

corroborating proof that the parties agreed to modify the mortgage:

> There is no further evidence in the record that Anderson, Frobouck, and
> Savor ever met and formally decided to modify, satisfy, or release the
> Anderson Note and Mortgage. It is also significant that the parties never
> bothered to document any such arrangement in the sixteen months which
> elapsed between the Franco's meeting and Bill Anderson's death.

Commonwealth, 540 B.R. at 187.   Accordingly, the "arrangement" to which the Court referred

did not involve the protection of the shareholders respective investments.

      Finally, the Movants suggest that the Court found that there was "no credible

evidence that William Anderson possessed the authority to unilaterally modify Ruth's rights

under the documents."  *Joint Motion* at ¶ 19d.  Here, the Movants accurately cite to the Court's

Opinion.   That was indeed the finding of the Court.   In light of the credibility findings of the

---

[7]    The Movants appear to rely on Samad's written investment analysis.  While the Court considered Samad's
testimony and the investment analysis spreadsheet, it did not find them to be probative or relevant:

> Samad prepared [the analysis] upon his own initiative and not at the request or direction
> of any party.   It therefore sheds no light into the mindset of the principals, nor is it
> conclusive of any intent to recast the Mortgage as equity.   To the contrary, the analysis
> distinguishes between funds advanced "via mortgage" from those made as direct
> investments or through payments on the line of credit.   Samad's testimony further
> confirmed that, at least initially, the Anderson Note and Mortgage were deemed to be
> legitimate, enforceable debt of Commonwealth.

Commonwealth, 540 B.R. at 189.

Court, and its analysis of the caselaw regarding parol evidence and the statute of frauds, the

Court is reluctant to ignore Ruth Anderson's rights without a writing.

The Movants raise other arguments in their *Joint Motion* that are seemingly

irrelevant to an appellate review of this Court's decision.  At ¶ 20(b) and (c) of the *Joint Motion*,

the Movants contend that reversal is appropriate because the Andersons never sought adequate

protection from the Court, and no proof was offered to suggest their interests were not

adequately protected.[8]  This argument misses the mark.  The Court's ruling was not predicated

on § 362(d)(1), which authorizes stay relief for cause, including a lack of adequate protection.[9]

Instead, the Court granted relief under § 362(d)(2) because Commonwealth failed to carry its

burden of establishing "a reasonable possibility of a successful reorganization within a

reasonable time."  It was therefore unnecessary for the Court to address issues involving

adequate protection.[10]  Because  the *Joint Motion* fails to identify any legal error with respect to

the Court's conclusions under § 362(d)(2), the Movants have again fallen short in showing a

strong likelihood of success on the merits.

In summary, the errors alleged by the Movants on appeal essentially challenge the

lack of weight this Court accorded to the testimony of Frobouck, Savor, and Samad.  While it is

---

[8]    See *Joint Motion* at ¶¶  20(b) ("The Andersons never requested adequate protection for the Debtor's
possession of the Property throughout the Bankruptcy Case.") and 20(c) ("The Andersons rested on their
pleadings an[d] presented no evidence whatsoever to establish a lack of adequate protection in the
Property.").

[9]    See Commonwealth, 540 B.R. a t 195 ("Because the Court grants relief under [§362(d)(2)], it does not
reach the merits of the motion for relief from stay under §362(d)(1).").

[10]    It is also inaccurate for the Movants to claim that adequate protection was never requested.  This contested
matter originated with the filing of a *Motion for Relief From Stay or, in the Alternative, for Adequate
Protection* by the Andersons wherein they sought "adequate protection payments from [Commonwealth] in
an amount sufficient to adequately protect [the Andersons] during the pendency of this case." [Dkt. No. 39
at ¶ 33].  When the Movants stipulated to the issues under submission to the Court, "[w]hether Ruth
Anderson is adequately protected in accordance with 11 U.S.C. §362" was among them. [Dkt. No. 149 at ¶
1(f)].  At the conclusion of the trial, the Andersons renewed their request for adequate protection through
their post-trial brief. [Dkt. No. 237 at p. 12 ("In the alternative, Mrs. Anderson is entitled, at a minimum, to
receive adequate protection payments, so that the amounts she is owed does not continue to increase.")].

conceivable that another court could review the same evidence and reach a different conclusion, this does not lead to a probability of success on appeal because the assessment of witness credibility by a trial court is subject to a "particularly deferential" standard on appeal. Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am., 609 F.3d 143, 156-57 (3d Cir. 2010) (citing Anderson v. City of Bessemer City, NC, 470 U.S. 564, 575 (1985)).  A court's findings of fact are clearly erroneous when they are "completely devoid of minimum evidentiary support displaying some hue of credibility or bear[] no rational relationship to the supportive evidentiary data."  Berg Chilling Sys., Inc. v. Hull Corp., 369 F.3d 745, 754 (3d Cir. 2004).   For so long as there is "some evidence" supporting the trial court's findings of fact, they are generally upheld.  In this instance, the Court placed greater weight on the transaction documents, communications, and other evidence created in 2006 to discern the parties' intentions at the time the Anderson advance was made.  While the Movants are no doubt disappointed by the outcome, the Court nonetheless had a rational basis for its conclusions based upon, among other things:  (a) the lack of any contemporaneous written documentation suggesting the parties intended to treat the advance as equity; (b) a similar lack of transactional documents that demonstrate an agreement to convert the loan into an equity contribution; (c) the inconsistencies between Frobouck and Savor's trial testimony and their past statements and actions; (d) the inconsistencies between Frobouck and Savor's trial testimony and the corporate records and documents prepared by Commonwealth; (e) the representations made by Commonwealth and its designees to third parties which suggest the Anderson advance was a loan; (f) the recognition that Frobouck and Savor's testimony is tainted with self-interest;  (g) the inability of William Anderson to refute or respond to testimony regarding any modification of the mortgage; and (h) Frobouck and Savor's possession of the legal training, sophisticated business experience, and the resources to recognize the

9

consequences that might result if a loan modification was not properly documented. For these reasons, the Movants have not presented a strong showing of "a reasonable chance, or probability, of winning" on the merits on appeal.

2.      Irreparable injury to the movant without the stay.

As discussed above, the Third Circuit considers this factor less important than the first but more important than the last two.  To establish irreparable harm, the applicant must demonstrate that "irreparable injury is likely [not merely possible] in the absence of [a] [stay]." Revel, 802 F.3d at 569 (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22  (2008) (emphasis in text).  The Third Circuit interprets the likelihood of irreparable injury as used in Winter to mean "more apt to occur than not."  Revel, 802 F.3d at 569.  A speculative or remote harm does not satisfy this standard.  Id. at 571 ("To establish irreparable harm, a stay movant 'must demonstrate an injury that is neither remote nor speculative, but actual and imminent.'") (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989).  An injury is also not "irreparable" if adequate remedies exist, either in the form of compensatory damages or other appropriate relief, to rectify any harm that is caused by a successful appeal. Sampson v. Murray, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); Conestoga Wood Specialties Corp. v. Sec'y of the U.S. H.H.S., 724 F.3d 377, 416 (3d Cir. 2013) ("Irreparable harm is injury for which a monetary award cannot be adequate compensation.").

The Movants argue that, if the Andersons are permitted to proceed with foreclosure, "it will likely deprive the Debtor of the Property – i.e., the Debtor's primary asset -- and eviscerate any opportunity that the Debtor has to reorganize its business." *Joint Motion* at ¶

25.   While it is correct that the result of the Court's Order will likely lead to a sale of the Property, this does not translate into an irreparable harm.   As the Court found, there is no reasonable possibility of reorganization for this debtor as a continuing business enterprise. Commonwealth, 540 B.R. at 180.[11]   Commonwealth proposed a liquidation plan whereby it intends to sell the Property and make distributions to creditors in accordance with their priority. [Dkt. No. 80].   Whether it loses the Property in foreclosure or through a sale conducted under a liquidating plan, the effect on Commonwealth is the same.   Simply stated, there is no harm to Commonwealth if the Property is foreclosed.[12]

As to Savor and Frobouck, the Court similarly cannot identify an irreparable harm.   Irrespective of who prevails on the appeal, the outcome only changes the amount each party can expect to receive from the sale of the Property.   Under the current Order, Savor and Frobouck are unlikely to receive any proceeds from a foreclosure sale because the Anderson claim substantially exceeds the value of the Property.   By contrast, if Savor and Frobouck prevail in having the Anderson contribution classified as equity, the bulk of the proceeds will be split

---

[11]   At the hearing on the *Joint Motion* on February 4, 2016, counsel for Frobouck and Savor provided information that reinforces the Court's finding.   He indicated that Commonwealth recently received a tentative offer of $3.7 million for the Property.   Counsel implies that this represents an improvement in economic conditions that may foreshadow an increase in the market value of the Property.   However, it is simply consistent with the year-old estimate by the Court-appointed broker of $3.5 to 4 million.   In short, after approximately three years on the market, there has been no appreciable rise in the marketability of the Property.   The Court reaffirms its finding that there is no reasonable prospect of reorganization of the debtor as a continuing business enterprise, or any reasonable prospect of a liquidation sale in the bankruptcy court that would provide funds in excess of the amount necessary to satisfy the Anderson claim.

[12]   The Movants also suggest that irreparable harm may result from any claim Reserved Environmental Services ("RES") may have against Commonwealth.   RES leased a ten-acre portion of the Property in 2010, and it is alleged that RES may have a claim for damages if its interest in the property is divested by a foreclosure sale.   It is also alleged that Commonwealth may have liability associated with any environmental clean-up if RES is forced to vacate the premises.   These issues are more appropriately addressed within the evaluation of harm to third parties and matters of public interest factors, infra.

among the shareholders equally.[13]  The difference is simply a matter of dollars and cents which

can be readily quantified.[14]  More importantly, adequate remedies exist under the law to

compensate Savor and Frobouck for any value lost during the pendency of the appeal.

The Movants argue that even if a suitable remedy existed, it is ineffectual because

the Andersons lack the ability to repay.  The Court finds no merit in this contention.  As the

parties previously reported to this Court, a state court judgment was recently issued in the

amount of $128,000,000 from which Frobouck, Savor, and the Andersons could receive

approximately $37,000,000 each.  [Dkt. No. 258].  Although the judgment has yet to be

liquidated, the ability to recoup up to $4,000,000 from the Andersons does not appear to be

insurmountable.

In summary of the first two factors, if "the chance of success on the merits [is

only] better than negligible" and the "possibility of irreparable injury" is low, a stay movant's

request fails.  Nken, 556 U.S. at 434.  Likewise, "even if a movant demonstrates irreparable harm

that decidedly outweighs any potential harm to the [stay opponent] if a stay is granted, [it] is still

required to show, at a minimum, 'serious questions going to the merits.'"  Revel, 802 F.3d at 569

(quoting In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985)).  After considering the

arguments presented, the Court concludes that the Movants have not shown irreparable harm or a

reasonable chance, or probability, of winning on the merits on appeal.

---

[13]    The Court recognizes that one of the remedies requested by the Movants was equitable subordination of the
Anderson claim which would render it junior to the equity interests of Frobouck and Savor.  For the
purpose of this discussion, the Court presumes only that the three equity interests would be treated
similarly.  Even if there were a basis to subordinate Anderson's equity interest to the interests of Savor and
Frobouck, this would not alter the Court's conclusion that this case will primarily determine how much
money each shareholder is entitled to receive from the sale proceeds.

[14]    Utilizing the stipulated Property value previously offered in this contested matter, the Court estimates the
potential recovery to Savor and Frobouck will range from $0 to $1,333,000, depending on the outcome of
this case.  [Dkt. No. 204].

3.    <u>Harm to other parties with an interest in the litigation</u>

After the Court has considered the two more important factors, the analysis shifts

to the lesser two.    <u>Nken</u>, 556 U.S. at 435.   <u>Revel</u>, 802 F.3d at 569,-+ instructs us to weigh the

likely harm to others against the harm to the stay opponents if the stay is granted.  This is the

balancing of harms or balancing of equities.

Aside from the Movants, the only parties affected by the stay relief order are the

Andersons, the taxing authorities, and RES.  The Andersons are certainly not harmed by an order

allowing the foreclosure to proceed, but having successfully obtained relief, they would be

prejudiced by a stay of the order.  Since the Anderson claim substantially exceeds the value of

the Property, any further delay in the liquidation of this asset erodes the value the Andersons can

expect to receive as their accruing interest and legal expenses will not be repaid.

The taxing authorities represent the only independent creditor in this case.  As the

holder of tax liens against the Property which are superior to the interests of any other party, the

taxing authorities stand to be paid in full regardless of whether the Property is sold in a

foreclosure or through a liquidation sale in the bankruptcy court.

RES is the only non-creditor considered in this discussion.   Commonwealth

suggests that RES will be harmed if a stay is not granted.  The Court is severely handicapped in

considering issues related to RES because of the dearth of verifiable information in the record.

RES itself has not taken a position regarding the *Joint Motion,* nor has it argued that it would be

harmed by foreclosure.   Frobouck and Savor appear to have represented RES's interests at

various times, but the Court finds it difficult to distinguish between the advocacy of

Frobouck/Savor as controlling directors of Commonwealth and Frobouck/Savor as controlling

directors of RES.  And as the Court observed in the Opinion, the Andersons have challenged the

RES lease itself "due to various alleged improprieties and self-dealings by Frobouck and Savor

which occurred when the lease was granted." In re Commonwealth Renewable Energy, 540 B.R.

at 194.

The Court finds that the suggestion that Commonwealth would be subject to legal

action for breach of the RES lease is purely speculative.  While the lease could be divested

through a foreclosure of the Anderson mortgage, RES may have assumed this risk if it entered

into the lease without the consent of the Andersons.  It is also unclear whether the Andersons or

a subsequent buyer would require RES to vacate the Property.    During the trial,

Commonwealth's real estate broker testified that the Property may be more attractive to potential

purchasers with a paying tenant on the premises.[15]  He also expressed an opinion that the RES

lease payments were on the "high side" of the market for what tenants could expect to pay for

equivalent square footage.[16]

In consideration of these interests, the Court does not find that the third factor tips

considerably in favor of the Movants.  To the extent RES may suffer potential harm if the stay is

denied, it appears to be no more severe than the harm the Andersons may sustain if the stay is

granted.  Without a decisive edge in favor of the Movants, the Court concludes that the level of

proof necessary to sustain this factor is lacking.

4.    The Public Interest

A stay will impact the public interest if it has "consequences beyond the

immediate parties." Roland Mach. Co., 749 F.2d at 388.  In this instance, the Movants argue that

any foreclosure which divests RES of its leasehold interest in the Property could lead to

significant environmental problems.  RES operates a water treatment facility on the Property

---

[15]    See deposition of Matthew Virgin, offered as Anderson Exhibit N at 87.

[16]    Id. at 88:4-11.

where it treats waste water from natural gas hydraulic fracking operations.[17]  If RES vacates the

Property, the Movants fear that the untreated water may develop into a hazard for the

surrounding community.

The Court agrees that it would be a matter of public interest if the foreclosure led

to the creation of a hazardous condition on the Property.  The Court is not convinced, however,

that a dangerous condition is likely to occur.  First, as noted above, there is no guarantee that

RES will be forced to vacate the Property.  While the RES lease may be divested in a foreclosure

sale, it would not be surprising if the new owner agreed to terms for RES to remain on the

Property.  In the absence of a viable alternative, a property owner may value a steady source of

lease revenue.  Second, as the holder of the undersecured mortgage, the Andersons have every

incentive to preserve the value of the Property.  Until they can liquidate their interests in the

Property, it would be unwise for the Andersons to take any action that would trigger additional

liabilities or impair their ability to effectuate a transfer.  Lastly, as the party engaged in this

activity, RES bears primary responsibility for the proper treatment and containment of hazards

on the Property.[18]  To the extent RES is unable to fulfill these obligations, the parties allude to

---

[17]     See *Debtor's Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Relating to the Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated October 29, 2014* (the "Disclosure Statement") [Dkt. No. 79 at § 3.5].

[18]     The Disclosure Statement suggests that RES holds permits from the Pennsylvania Department of Environmental Protection for a National Pollutant Discharge Elimination System and is subject to regular site inspections.  Id.  In addition to the applicable federal and state regulations, RES owes obligations to Commonwealth under its lease.  See *Lease and Option to Purchase Agreement* dated April 1, 2010 between Commonwealth and RES (the "Lease"), attached as Exhibit 1 to Anderson Exhibit N.  Under section 48 of the Lease, RES agrees to indemnify Commonwealth against:

> any loss, liability, claim or expenses, including without limitation, cleanup, engineers and attorneys' fees and expenses and fines that [Commonwealth] may incur by reason of the use, generation, storage, treatment, disposal by [RES] of any toxic or hazardous wastes or substances on [the Property] except for normal, office cleaning and maintenance supplies that are used, stored and disposed of by [RES] in accordance with applicable law.

the existence of a bond which may address remediation costs associated with the Property.[19]

Although the Court received only minimal information in this regard, the Movants bear the

burden of establishing a genuine harm to the public interest.  Without proof of a discernable

danger to the public interest that rises above mere speculation, the Court is unable to conclude

that this factor favors a stay.

After consideration of each of the four factors required to justify a stay, the

Movants have failed to carry their burden.  The Court therefore finds that the *Joint Motion* is not

well taken and will be denied.[20]

An appropriate Order will issue.

February 10, 2016

GREGORY L. TADDONIO ct
UNITED STATES BANKRUPTCY JUDGE

Debtor
Paul J. Cordaro, Esq.
Kirk B. Burkley, Esq.
Robert O Lampl, Esq.
Karen Y. Bonvalot, Esq.

---

Lease at § 48.  RES also has an obligation to indemnify Commonwealth against any claims or expenses caused by its use or occupancy of the Property and it must maintain general liability insurance for the Property, naming Commonwealth as an additional insured.  Id. at §§ 20, 22.

19    While the bond was only casually referenced during oral argument on the *Joint Motion*, Commonwealth previously suggested that RES obtained a $2.5 million bond in favor of the Pennsylvania Department of Environmental Protection to guard against "any discharges from the frac pond."  Disclosure Statement at §3.5.

20    The Movants' request for an opportunity to post a $2,500 bond as security during the pending appeal is also denied.   The Court has substantial discretion under Rule 8007 to grant stays pending appeal on the basis of the posting of bonds.  In re Motors Liquidation Co., 539 B.R. 676, 686 (Bankr. S.D.N.Y.).  Irrespective of whether the Property is declining in value, the Movants have offered no proof that this amount will adequately address any potential damage the Andersons may incur by reason of a stay.